```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/20/2022_____
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RABBI ISRAEL MEYER HACOHEN
RABBINICAL SEMINARY OF AMERICA,

                              Plaintiff,

                v.

TOWN OF PUTNAM VALLEY and TOWN OF
PUTNAM VALLEY PLANNING BOARD,

                              Defendants.

21 CV 07050 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiff Rabbi Israel Meyer Hacohen Rabbinical Seminary of America ("Plaintiff" or the "Seminary") brings this action against Town of Putnam Valley (the "Town") and Town of Putnam Valley Planning Board (the "Planning Board," together "Defendants"), asserting two claims under the Religious Land Use and Institutionalized Persons Act and a 42 U.S.C. § 1983 claim for alleged violations of the Plaintiff's rights under the Fourteenth Amendment's Equal Protection Clause. (ECF No. 1.)  Presently pending before the Court are Defendants' motion to dismiss the Complaint under Federal Rules of Civil Procecdure 12(b)(1) and (6).  (ECF No. 18.)  For the following reasons, the Court GRANTS Defendants' motion to dismiss.

## BACKGROUND

The following facts are taken from Plaintiff's Complaint (ECF No. 1) and are accepted as true and construed in the light most favorable to Plaintiff for purposes of this motion.

### The Property At Issue

This matter involved five parcels of land located immediately adjacent to and east of Barger Street in Putnam County (the "**Property**").  (Compl. ¶¶ 11; 19; 18.)  The Property includes Tax Lot 85.13-1-29 ("Lot 29"); Tax Lot 85.13-1-33.1 ("Lot 33.1"); Tax Lot 85.13-1-33.2 ("Lot 33.2");

and two *de minimis* "out parcels" known as Tax Lots 85.13-1-31 and 85.13-1-32 (collectively, the "County Parcels").  Plaintiff owns Lots 29 and 33.2 in fee simple title.  (*Id*. ¶¶ 19, 52.)

Lot 29 is a vacant 46.8 acre parcel located in the Town's Moderate Density Residential District, and a significant portion of the Lot is environmentally constrained, with a large, regulated wetland area on the northern portion of the Lot.  (*Id*. ¶¶ 21, 41.)  By Deed dated September 3, 2013, Lot 29 was transferred to Plaintiff by charitable donation.  (*Id*. ¶ 39.)

Lot 33 (now separated into Lot 33.2 and Lot 33.1) was initially transferred to Plaintiff by charitable donation on December 12, 2013.  (*Id*. ¶ 44.)  However, following the Town and The Larksburg Cemetery Corporation's ("LCC") challenges to Plaintiff's title over Lot 33, Plaintiff commenced a Quiet Title action on July 23, 2015.  (*Id*. ¶ 186.)  Lot 33 was split into what is now known as Lot 33.2 and Lot 33.1 after a so-ordered Stipulation of Settlement was issued on August 31, 2016.  LCC now has undisputed title over Lot 33.1, which contains the historic Larksburg Cemetery.  (*Id*. ¶¶ 19; 25.)  LCC granted Plaintiff certain easement rights over Lot 33.1.  (*Id*. ¶¶ 28–29.)  Specifically, Plaintiff has an easement for maintenance over the acres comprising the Larksburg Cemetery, and an unrestrict easement over the remaining acres.  (*Id*. ¶¶ 30–31.)  Plaintiff kept Lot 33.2, which is a vacant 15.96 acre parcel located in the Town's Preservation District.  (*Id*. ¶ 22.)

Lastly, Putnam County owns the County Parcels.  (*Id*. ¶¶ 18–19.)  Plaintiff had discussions with Putnam County for the purchase of their two parcels, and by Resolution #116 of 2014, the Putnam County Legislature agreed to transfer the parcels to Plaintiff.  (*Id*. ¶¶ 33–35, Exh. B.)  The County Parcels are located in the Town's Moderate Density Residential District.  (*Id*. ¶ 34.)

***Plaintiff's Plan to Develop A Religious Cemetery***

Plaintiff is a not-for-profit Orthodox Jewish Yeshiva. (Compl. ¶¶ 10, 38.) Plaintiff decided to develop Lots 29 and 33 as a centralized religious cemetery, which would include burial grounds, office space, a chapel, an equipment shed, a parking lot, and roadways (the "**Project**"). (*Id.* ¶¶ 45–46.) The Project would be established pursuant to the authority of the New York State Religious Corporation Law. *See* N.Y. Religious Corp. Law § 7 ("Acquisition of Property by Religious Corporations for Cemetery Purposes; Management Thereof"). (*Id.* ¶ 47.)

At the time that Plaintiff acquired the lots, there was evidence that burials may have occurred along the shared property lines of Lot 29 and Lot 33, including encroachments into Lot 29. (*Id.* ¶ 49.) After confirming the same, Plaintiff affirmed its intention to not disturb areas determined to have existing burial sites on Lot 29, and represented to Defendants that it would affirmately preserve and protect the burial sites. (*Id.* ¶ 50.) Plaintiff also has no intention to to disturb the portion of Lot 33.1 containing existing burial sites, except to ensure, by agreement with LCC, that the previously neglected area is aesthetically maintained. (*Id.* ¶ 48.)

### *Religious Practices and Requirements*

In Judaism, cemetaries are places of worship, and are essential to Plaintiff's congregation and affiliates. (*Id.* ¶¶ 53–54.) Jewish law requires in-ground burial, and in order to be done in full accordance with Jewish tradition, the cemetery must be administered by religious authority. (*Id.* ¶¶ 55, 58.) The Project is crucial for Plaintiff's members to practice this aspect of the Jewish faith. (*Id.* ¶ 60.) While there are existing Cemetery Corporations in the New York area that cater to the Jewish community, the necessary requirements are not always adhered to, and some cemeteries are limited to their respective congregations. (*Id.* ¶¶ 61–62.) Plaintiff's members must choose to either be buried in Israel, or purchase plots from a Cemetery Corporation that may not adhere to

the necessary religious laws.  (*Id*. ¶ 63.)  In addition, available burial space in the New York area is dwindling.  (*Id*. ¶ 64.)

***Plaintiff's 2014 Application to the Planning Board***

Cemeteries are not a permitted use in any zoning district within the Town, and the existing cemeteries in the Town are pre-existing nonconforming uses under the Zoning Code, including Larksburg Cemetery and Rose Hills Memorial Park ("Rose Hills Cemetery").  (*Id*. ¶¶ 68, 70.)

On or about January 10, 2014, Plaintiff submitted an application to the Planning Board seeking Sketch Plan Approval "for the purposes of a religious cemetery" on Lots 29 and 33.  (*Id*. ¶¶ 71–72.)  Sketch Plan Approval is a preliminary step in the Planning Board's development plan approval process.  (*Id*. ¶ 74.)  As historic burials had occurred on both Lots 29 and 33, Plaintiff sought to expand the existing nonconforming use to all of Lot 29.  (*Id*. ¶ 75.)  Nonconforming use in a residential district may be enlarged by approval of the Planning Board for "nonconforming educational, philanthropic, or religious uses."  (*Id*. ¶ 76 (citing Zoning Code § 165-45(A)(1)(a).)  In the alternative, in the event the Planning Board intended to deny Sketch Plan Approval, Plaintiff sought a referral to the Town Zoning Board of Appeals ("ZBA") for the purposes of "an interpretation that the cemetery use on [Lot 33] may be continued, as well as expanded onto the adjoining [Lot 29], for the proposed religious use."  (*Id*. ¶ 77.)

The Project was first heard at the Planning Board's January 27, 2014 meeting.  (*Id*. ¶ 78.)  The Planning Board had many questions.  (*Id*. ¶¶ 79–84.)  On or about March 10, 2014, Plaintiff submitted additional materials to the Planning Board, including responses to the questions raised at the meeting.  (*Id*. ¶ 85.)  Plaintiff also amended its application to seek, in the alternative, a Special Use Permit in accordance with Article X of the Zoning Code, Section 165-36(V), which

sets forth the applicable specific criteria for "[e]ducational orphilanthropic uses by nonprofit organizations and houses of worship." (*Id*. ¶¶ 86–87.)

The Project next appeared before the Planning Board at its March 24, 2014 meeting. (*Id.* ¶ 98.) The Planning Board unanimously agreed that the cemetery use on Lot 33 was a legal, pre-existing nonconforming use, but the Planning Board declined to grant the application permitting the expansion of the nonconfirming use onto Lot 29. (*Id.* ¶ 100.) Instead the Planning Board denied Sketch Plan Approval as to Lot 29 and referred the Project to the ZBA for an interpretation as to whether Zoning Code Section 165-45(A)(1)(a) is applicable and whether a religious cemetery may apply for a special use permit as a "House of Worship." (*Id.* ¶¶ 101–102.)

On or about April 4, 2014, Plaintiff made its first submission to the ZBA, seeking an interpretation that the Planning Board has the authority to grant the Project a Special Use Permit under Zoning Code Section 165-36(V), or in the alternative, an interpretation that that the Planning Board has authority to grant the Project Development Plan Approval pursuant to Zoning Code Section 165-45(A)(1)(a), *i.e.*, the Expansion Application. (*Id.* ¶¶ 104–06.)

While the ZBA interpretation application was pending, Plaintiff submitted to the Town an application for a Commence Work Permit for the purpose of conducting soil test pits on Lot 29. (*Id.* ¶ 107.) The Town issued Plaintiff the Commerce Work Permit on or about June 20, 2014. (*Id.* ¶ 110.)

Prior to the April 24, 2014 ZBA meeting, the Town attorney provided a letter outlining issues that the ZBA should address. (*Id.* ¶ 112.) Among other things, the Town attorney stated that Plaintiff's ownership of Lot 33 had been "called into question by a relative of now-deceased

Rv. Lawson."[1]  (*Id*. ¶ 115.)  The Town attorney further asked that a full title search be provided by Plaintiff to evaluate its good title to Lot 33 in order to see if Plaintiff had standing to seek approval for the Project, and that the ZBA determine whether "a cemetery (religious or non-religious) on this particular site [should] be prohibited as a use that 'may discharge hazardous materials into the ground or surface water.'"  (*Id*. ¶ 118.)  The concern arose because the Property is located in the Town's Ground and Surface Water Protection Overlay District.  (*Id*. ¶ 119.)  Other cemeteries are also located in the Town's Ground and Surface Water Protection Overlay District, including Rose Hills Cemetery.  (*Id*. ¶¶ 120–21.)

During the April 24, 2014 ZBA meeting, Plaintiff presented its Special Permit Applciation and the Expansion Application in the alternative.  (*Id*. ¶ 124.)  At that meeting, a representative of ZBA questioned whether Plaintiff had good title to Lot 33, noting a defect in the title due to a prior deed not being recorded in the chain of title from 1973 to 2013. (*Id*. ¶¶ 125, 140.)  The ZBA also discussed at length whether the use of the Property as a cemetery would result in the discharge of hazardous materials into the ground or surface water, because it would reject the Expansion or Special Permit Applications if so.  (*Id*. ¶ 126.)[2]  Plaintiff explained that environmental issues would be addressed by the Planning Board during its review of the Project pursuant to the New York State Environmental Quality Review Act ("SEQRA").  (*Id*. ¶ 128.)

On May 9, 2014, Plaintiff submitted written responses to the Town attorney's letter, addressing various issues it raised, including concerns regarding discharge of hazardous waste into groundwater and Plaintiff's good title to Lot 33.  (*Id*. ¶¶ 131–40.)

---

[1]      Bishop Robert Lawson is a historical figure in Putnam County. He was one of the founding fathers of the Pentecostal movement, and established a summer colony for the middle-class Black community in the vicinity of the Property.  Bishop Robert Lawson and his wife are buried in the Larksburg Cemetery.  (Compl. ¶¶ 25–26.)

[2]      Plaintiff alleges that the issue of discharge of hazardous materials into the ground or surface water was not properly before the ZBA.  (Compl. ¶ 127.)

At next ZBA meeting on May 29, 2014, the Town attorney raised issues pertaining to New York Real Property Law ("RPL") § 451, which requires consent of the County Legislature for property to be used as a cemetery.[3]  (*Id*. ¶¶ 146–47.)  As a result, the Town decided to not process the Plaintiff's application unless Plaintiff first submitted an application to the County Legislature pursuant to RPL § 451.  Plaintiff went forward and submitted an application to the County Legislature on or about July 3, 2014.  (*Id*. ¶ 153.)

***County Legislature Meeting***

The County Legislature's Health, Social, Educational & Environmental Committee ("Committee") discussed Plaintiff's RPL Application at its August 12, 2014 meeting.  (*Id*. ¶ 154.) The Committee determined that the RPL Application was premature, and that the Town should first process Plaintiff's application for the Project before the County Legislature granted its consent.  (*Id*. ¶ 158.)  On September 22, 2014, the County Legislature issued a letter to the Town stating that the RPL Application was premature, and that the "Town should first render its land use determinations, including undertaking and concluding its environmental review under SEQRA."  (*Id*. ¶ 160.)  In response, the Town sent a letter to the County Legislature, dated October 14, 2014, asking the County Legislature to re-examine its position that the Town approvals precede consent pursuant to RPL § 451.  (*Id*. ¶ 163.)  In a letter dated on December 12, 2014, the County Legislature stated it declined to reconsider its position, urging the Town to proceed with its own local land use, zoning, and SEQRA review.  (*Id*. ¶¶ 164, 166.)

***Plaintiff's Request to be Reinstated to ZBA Agenda in 2015***

---

[3]     Plaintiff alleges that this issue was raised due to Exclusion #10 in the Seminary's Title Policy, which reads "Policy excepts all claim or loss due to failure to obtain consent of [the County Legislature] as to the intended use of insured premises as cemetery lands. (As required by Real Property Law, Section 451)." (*Id*. ¶ 148.)  Plaintiff argues that the Title Policy simply states that it would not insure the Seminary's right to use the Property as a cemetery unless consent is obtained from the County Legislature.  (*Id*. ¶ 150.)

On or around March 17, 2015 Plaintiff sought to be reinstated to the ZBA agenda in connection with its application for an interpretation that it could proceed before the Planning Board pursuant to its Special Permit Application, or in the alternative, the Expansion Application.  (*Id*. ¶ 168.)  After being advised by the Town attorney that it must revise its application to the ZBA to refer solely to Lot 29, and not Lot 33, Plaintiff resubmitted it application to the ZBA pertaining solely to Lot 29. (*Id*. ¶ 169.)

On May 13, 2015, the Plaintiff's counsel received an email from the Town's Planning & Zoning Board Clerk advising that LCC had submitted a letter again raising questions as to the Plaintiff's title to Lot 33, and was advised to present before the Planning Board the title search for its application. (*Id*. ¶¶ 173–74.)  Plaintiff went before the Planning Board on May 18, 2015, equipped with a binder of title documents, but was advised that all further reiew of the Project was suspended, and that the Planning Board was retaining a title attorney to review the Plaintiff's chain of title.  (*Id*. ¶¶ 176–80.)

On or about June 1, 2015, Plaintiff was advised that it was being required "to post additional escrow to cover the cost of the consultant's reviewing the title issue."  (*Id*. ¶ 181.)  On June 8, 2015, Plaintiff advised the Planning Board and ZBA that it did not consent to use of its escrow funds for the Town to retain title counsel, and that the Town lacked jurisdiction to determine the validity of Plaintiff's ownership of property.  (*Id*. ¶ 182.)  Plaintiff indicated that it would instead pursue its own Quiet Title action.  (*Id*. ¶ 185.)

***Quiet Title Action Over Lot 33***

On or about July 23, 2015, Plaintiff commenced a Quiet Title action (the "Quiet Title Action") against LLC.  (*Id*. ¶ 186.)  A Quiet Title Stipulation was So-Ordered by the state court on August 31, 2016, which determined that Plaintiff owned Lot 29 and the portion of Lot 33 now

designated by the Town as Lot 33.2, and LCC obtained from Plaintiff by quitclaim deed definitive title to what is now designated by the Town as Lot 33.1. (*Id*. ¶ 187–90.)  As part of the Quiet Title Stipulation, LCC also expressly consented to Plaintiff's Project.  (*Id*. ¶ 191.)  During the time that the Quiet Title Action was pending, Plaintiff did not undertake analysis to determine the feasibility of the Project or to design and engineer the Project in order to avoid expenses.  (*Id*. ¶ 231; Plaintiff's Sur-Reply (ECF No. 25) ¶ 8 (stating that all work on the first Commence Work Permit ended before June 20, 2015))

### *2016 Moratorium on Cemeteries*

On or about September 7, 2016, Plaintiff sought to have the Project reinstated to the ZBA agenda for its interpretation application, and apprised the ZBA, Planning Board, and Town attorney of the terms of the Quiet Title Stipulation.  (*Id*. ¶ 194.)  At some point after, Plaintiff was informed that on January 13, 2016, the Town had adopted a nine-month moratorium on the development of cemeteries in the Town.  (*Id*. ¶ 197.)  The basis for the moratorium was to clarify "the definition of a cemetery and the definition of a burial ground."  (*Id*. ¶ 199.)  The moratrium was extended through December 31, 2016.  (*Id*. ¶ 200.)

On November 4, 2016, a Freedom of Information Law ("FOIL") request was submitted on behalf of Plaintiff seeking, *inter alia*, any and all documents pertaining to the adoption of the Moratorium, as well as any documents in the Town's files in furtherance of the purpose of the Moratorium.  (*Id*. ¶ 206.)  The moratorium was briefly discussed in the Town Planning Board's January 13, 2016 meeting minutes and issued in a one-sentence Resolution within those meeting minutes.  (*Id*. ¶¶ 198–99.)   Plaintiff only learned of the Moratorium's existence in September 2016, and since it expired in December 2016, Plaintiff opted not to bring a legal challenge due to costs and to prevent additional delay.  (*Id*. ¶ 209.)

***Plaintiff's 2017 Request to be Reinstated***

On or about April 5, 2017, Plaintiff once again requested to be reinstated to the ZBA agenda. (*Id.* ¶ 211). In response, Plaintiff was advised by the Town attorney that it must go back to the Planning Board to "confirm" the referral to the ZBA in light of the Quiet Title Stipulation. (*Id.* ¶ 212). By letter, dated May 2, 2017, Plaintiff objected to the continued and years-long delay in the processing of the Project's applications. (*Id.* ¶ 215.)

Plaintiff appeared before the Planning Board at its June 5, 2017 meeting. At that time, the Town attorney informed that the Quiet Title Stipulation, despite being So-Ordered by the Court, may have created "an illegal subdivision" of Lot 33 when it was separated into Lots 33.1 and 33.2." (*Id.* ¶ 217.) The Planning Board advised Plaintiff for the first time that it may require variances regarding the "illegal subdivision", but did not elaborate on what approvals would be required. (*Id.* ¶ 218.)

On September 1, 2017, the Town's special counsel, Mr. Lusardi, advised Plaintiff that its interpretation application seeking a determination that the Project constituted a "House of Worship," or in the alternative, the nonconforming cemetery use could be expanded onto Lot 29, would be reinstated to the ZBA agenda. (*Id.* ¶ 221.) The next work session of the ZBA was scheduled for September 7, 2017, but it was adjourned due to a lack of a quorum. (*Id.* ¶¶ 221–22.)

A special meeting work session was held on September 28, 2017, at which time the interpretation application was discussed by the ZBA on its merits. (*Id.* ¶ 223.) On or about October 12, 2017, Plaintiff submitted additional materials in support of its interpretation application, and expressly withdrew its Expansion Application. (*Id.* ¶¶ 224–25.)

***Public Hearings and ZBA's Grant of "House of Worship" Interpretation***

10

On October 26, 2017 and November 30, 2017, public hearings were held in connection with the interpretation application.  (*Id*. ¶  227.)   The ZBA issued its Decision & Order on December 13, 2017, which granted the interpretation that the Project is a "House of Worship" under the Zoning Code and is thus a permitted use by special permit on the Property.  (*Id*. ¶¶ 228–29.)

### Second Application for Commence Work Permit

After the ZBA confirmed that the Project was permitted on the Property under the "House of Worship" interpretation, Plaintiff sought to undertake additional site analyses to further determine the feasibility of the Project, as well as to design and engineer the Project.  (*Id*. ¶ 230.) On or about March 26, 2018, Plaintiff submitted a second application to the Town for a second Commence Work Permit to dig ten test pits with piezometer devices to monitor ground water levels and perform a hydrogeological analysis on the Property.  (*Id*. ¶¶ 232–33.)

The second Commence Work Permit took eight months to be issued because of back and forth between the Plaintiff's consultants and the Town's consultants.  (*Id*. ¶ 236.)  The Town required Plaintiff to obtain a wetland permit waiver for the purpose of crossing hydric soils over an access path.  (*Id*. ¶ 237.)  The Town also required that Plaintiff include in its scope additional analyses of the ground water, which the Town indicated would ultimately be necessary for the SEQRA review of the Project.  (*Id*. ¶ 239.)  The Planning Board Chairman was asked to be copied on any and all correspondence pertaining to the Commence Work Permit to ensure that the Planning Board remained apprised at every step of the process.  (*Id*. ¶ 241.)  Plaintiff acquiesced to all of the Town's demands.  (*Id*. ¶ 242.)

### 2018 Planning Board Submissions and Meetings

On October 26, 2018, Plaintiff submitted documents to the Planning Board seeking reinstatement to its agenda for discussion, given that Plaintiff had not been issued a second Commence Work Permit seven months after it had applied for one.  (*Id*. ¶ 243.)  The submission explained current work being undertaken with the Town's hydrogeologists and also sought guidance on what approvals Plaintiff would be required by the Planning Board to seek.  (*Id*. ¶ 245.)  Specifically, Plaintiff requested that the Planning Board determine whether it would be required to seek subdivision approval or variances.  (*Id*. ¶ 247.)

At the November 5, 2018 Planning Board meeting, the Planning Board refused to provide any guidance to Plaintiff regarding approval or variances.  (*Id*. ¶ 248.)  Plaintiff was also advised at the November 5, 2018 Planning Board meeting that prior to commencing work, the scope of work and methodology would be reviewed and verified to ensure it was acceptable to the Town and the Planning Board.  (*Id*. ¶ 251.)

***Second Commence Work Permit Issued***

The second Commence Work Permit was issued by the Town on or about November 30, 2018.  (*Id*. ¶ 249.)  Between December 2018 and January 2020, Plaintiff conducted field investigations and data collection, which were conducted with oversight by the Town's hydrogeological consultant.  (*Id*. ¶¶ 254–55.)  A qualified archeologist retained by Plaintiff was also on-site during all intrusive field studies due to the potential presence of historic grave sites in the vicinity, and per the requirements of the Town and the New York State Historic Preservation Office.  (*Id*. ¶ 256.)  Plaintiff's archeologist also conducted the following analyses: (i) Phase 1A Literature Search and Sensitivity Assessment; (ii) Phase 1B Archaeological Field Reconnaissance Survey; and (iii) ground penetrating radar survey ("GPR Survey") (conducted in the areas adjacent

to the existing Larksburg Cemetery boundaries) to evaluate for the presence of historic grave sites. (*Id*. ¶ 257.)

However, some of the work was delayed because of the COVID-19 pandemic in 2020.  (*Id*. ¶ 260.)

### *May 2021 Planning Board Submission ad Town Attorney Letter*

Plaintiff submitted an extensive application to the Planning Board on or about May 4, 2021. (*Id*. ¶ 260.)  Plaintiff was advised by Defendants that due to the passage of time, the application to the Planning Board would be considered a "new" application.  (*Id*. ¶ 261.)  Plaintiff was required to post new payments to the Planning Board escrow account, and to pay a new application fee. (*Id*. ¶ 262.)  Even though Plaintiff believed that it was simply updating the application it had pending since 2014, it acquiesced, and submitted a 372-page Hydrogeologic Report, which also annexed the various studies undertaken by Plaintiff's archaeologist and included revised Site Plan drawings that avoided existing burial sites.  (*Id*. ¶¶ 262–65.)

On or about May 14, 2021, Plaintiff received a copy of a letter from the Town attorney to the Planning Board opining that the application could not proceed for numerous reasons.  (*Id*. ¶ 269 and Exh. FF.)

The Town attorney raised issues relating to Plaintiff's standing to pursue the Project.  (*Id*. ¶ 271.)  The Town attorney questioned the fact that LCC had not signed the Application, even though Plaintiff submitted the letter from LCC consenting to the Project.  (*Id*. ¶ 272.)   The Town attorney also noted that the County Parcels had yet to been transferred, even though the County indicated that it would do so after approval was obtained.  (*Id*.)  The Town attorney questioned why the Plaintiff did not conduct a GPR Survey on the entire Lot 29, but limited the GPR survey to the areas sharing a border Lot 33.1.  (*Id*. ¶¶ 275–76, Exh. FF.)  The Town attorney also cited to

Plaintiff's hydrogeologic report to indicate that there are around 200 to 240 potential gravesites on the property, rather than just 40 gravesites that were previously accounted for in Plaintiff's original submission.  (*Id*. at Exh. FF). Citing to Plaintiff's hydrogeological report, the Town attorney raised concerns that there were more gravesites in areas that were not surveyed, and claimed that the Project would pave over "unidentified gravesites" and "will almost certainly result in the unintentional disinterment of bodies and/or the desecration of graves."  (*Id*. ¶ 277 and Exh. FF.) The Town attorney took the position that "the rights of the families of the decedents buried in Larksburg Cemetery must be respected, and those families must consent to the present application." (*Id*. ¶ 279.)  Lastly, the Town attorney, for the first time, claimed that the Town "may have ownership rights in the subject property under New York State Town Law §§ 290 to 296," which relates to abandoned cemeteries.  (*Id*. ¶ 282.)

The Project was placed on the May 24, 2021 Pllanning Board agenda, and even though Plaintiff was advised that the matter would not be heard and would be adjourned, upon information and belif, the Planning Board retained the Project on the agenda without advising Plaintiff.  (*Id*. ¶¶ 286–87.)

Plaintiff initiated this action on August 21, 2020.  (ECF No. 1.)  Defendant filed a motion to dismiss on December 28, 2021.  (ECF No. 18.). The parties filed their respective briefing on the instant motion, and Plaintiff filed a short sur-reply on January 10, 2022 after being granted permission to do so.  (ECF Nos 19–25.)

In its sur-reply, Plaintiff dropped its claims for monetary damages (Pl.'s Sur-Reply ¶ 30) but continues to seek the following injunctive relief: (i) enjoining Defendants from continuing to violate Plaintiff's religious and civil rights; (ii) enjoining Defendants from interfering with the processing of the lawful religious; and (iii) mandating that Defendants process the application for

the Seminary's Project in good faith and in due course land use of the Seminary.  (Compl. ¶ 328.)

Plaintiff also seeks costs, disbursements, and attorney's fees pursuant to 42 U.S.C. § 1988.  (*Id.*)

## LEGAL STANDARD

### I.    Federal Rule of Civil Procedure 12(b)(1)

"[F]ederal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) (internal quotation omitted). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011) (internal quotation omitted).  The party invoking the Court's jurisdiction bears the burden of establishing that jurisdiction exists.  *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009).

When, as here, the case is at the pleading stage, in deciding a motion to dismiss under Rule 12(b)(1), the Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Id.*  But "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." *Buday v. N.Y. Yankees P'ship*, 486 F. App'x 894, 895 (2d Cir. 2012) (summary order) (quoting *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992)).

### II.    Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When there are well-pled factual allegations in the complaint, "a court

should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679.

While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 662, 678 (quoting *Twombly*, 550 U.S. at 555). The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A motion to dismiss will be denied where the allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In applying these principles, the Court may consider facts alleged in the complaint and documents attached to it or incorporated by reference. *Chambers v. Time Warner, Inc*., 282 F.3d 147, 152–53 (2d Cir. 2002) (internal quotation marks and citation omitted).

## DISCUSSION

In their Complaint, Plaintiff asserts three claims against all Defendants: (1) an as-applied RLUIPA claim for "substantial burden" under 42 U.S.C. § 2000cc-2(a); (2) another as-applied RLUIPA claim for "equal terms" under 42 U.S.C. § 2000cc-2(b)(1); and (3) a 42 U.S.C. § 1983 claim for alleged violations of the Plaintiff's rights under the Fourteenth Amendment's Equal Protection Clause. (Compl. ¶¶ 300–28.)

The Defendants seek to dismiss Plaintiff's claims for lack of subject matter jurisdiction based on ripeness, as well as for failure to state a claim. (Defs.' Br. (ECF No. 19) at 1, 15–20.). Defendants also seek dismissal based on statutes of limitation for each of the claims. (*Id*. at 10–

14.)   Finally, Defendant Town Planning Board argues that claims raised against it must be dismissed because it is a non-suable entity.[4]   (*Id.* at 21.)

Accordingly, the Court must first address the Town Defendants' challenge to subject matter jurisdiction and will analyze whether Plaintiff fails to state a claim against all Defendants only if the Court has subject matter jurisdiction over this case.  *See Brokamp v. James*, No. 21-CV-389, 2021 WL 5444277, at *2 (N.D.N.Y. Nov. 22, 2021) ("Subject matter jurisdiction is a threshold issue and, thus, when a party moves to dismiss under both Rules 12(b)(1) and 12(b)(6), the motion court must address the 12(b)(1) motion first." (citations omitted)).

## I.   <u>Ripeness</u>

For the reasons stated below, the Court finds that Plaintiff's claims are not yet ripe. Therefore, the Court dismisses Plaintiff's claims in their entirety, without prejudice.

### *Legal Standard*

The doctrine of ripeness is closely related to the doctrine of standing.  "The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).  The Second Circuit has explained that "the best way to think of constitutional ripeness is as a specific application of the actual injury aspect of Article III standing . . . . Constitutional ripeness, in other words, is really just about the first Lujan factor[,]" whether a plaintiff's injury is concrete, particularized, and actual or imminent.  *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013).  "The ripeness requirement prevents a federal court

---

[4]      While Defendants argue in their opening brief that the Town Planning Board must be dismissed because the Planning Board is a department of the Town and a non-suable entity,  (Defs.' Br. at 21.), Defendants appear to have limited their argument on Reply by specifying only that Plaintiff's claims for damages should be dismissed as against the Planning Board.  (Defs.' Reply at 9–10).  In its sur-reply, Plaintiff concedes that "monetary damages cannot be recovered from the Town Planning Board and the Town itself.  The Complaint names the Planning Board to ensure that the Seminary can obtain the injunctive relief sought . . . ." (Pl.'s Sur-Reply ¶ 30.)

from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002).

To establish that a claim is ripe in the land-use context, and especially where there is a challenge to a local zoning determination, "the Court must apply the first prong of the analysis the Supreme Court articulated in *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985)." *Islamic Cmty. Ctr. for Mid Westchester v. City of Yonkers Landmark Pres. Bd.*, 258 F. Supp. 3d 405, 416 (S.D.N.Y. 2017), *aff'd*, 742 F. App'x 521 (2d Cir. 2018); *see also Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 247 (2d Cir. 2005) (explaining that the "prong-two ripeness test" only applies to takings challenges); *see also Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2167 (2019) (doing away with the second prong in *Williamson* and holding that a property owner who has "suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation . . . may bring his claim in federal court under § 1983 at that time").

The first prong of the *Williamson County* test requires that a plaintiff plead facts showing that "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty.*, 473 U.S. at 186. This "final-decision requirement helps distinguish between those cases in which a plaintiff has suffered a 'concrete and particularized,' 'actual or imminent' injury, and those in which the injury is 'merely speculative and may never occur, depending on the final administrative resolution.'" *Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 122 (2d Cir. 2014) (quoting *Dougherty*, 282 F.3d at 90). "In other words, a non-final decision on how a parcel of land

may be used does not ordinarily give rise to an injury that is sufficiently concrete and particularized to satisfy Article III." *Id.*

To meet the final-decision requirement, the plaintiff must "obtain a final, definitive position as to the application of the relevant zoning law to the property from the municipal entity responsible for those laws." *Islamic Cmty.*, 258 F. Supp. 3d at 416 (*quoting Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 915 F. Supp. 2d 574, 597 (S.D.N.Y. 2013)) (internal quotation marks omitted). As such, a "plaintiff cannot seek federal court review of a zoning ordinance or provision until it has submitted at least one meaningful application for a variance' from the restrictions of the land-use laws." *Id.* Although this ripeness paradigm was originally developed by the Supreme Court in the context of a regulatory takings challenge, *see Williamson County*, 473 U.S. at 186, the Second Circuit has extended the finality requirement to land use disputes involving to as-applied challenges to land use laws under RLUIPA, the First Amendment, and the Equal Protection Clause. *Orthodox Jewish Coal. of Chestnut Ridge v. Vill. of Chestnut Ridge, New York*, No. 19-CV-443 (KMK), 2021 WL 1226930, at *9 (S.D.N.Y. Mar. 31, 2021) (citing cases), *on reconsideration*, No. 19-CV-443 (KMK), 2021 WL 3605041 (S.D.N.Y. Aug. 13, 2021) .

Courts recognize one exception permitting federal court review of a non-final decision—"if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile." *Murphy*, 402 F.3d at 349. This occurs when "a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied." *Id.* Courts have interpreted this futility exception narrowly. *Missere v. Gross*, 826 F. Supp. 2d 542, 555 (S.D.N.Y. 2011). Although the precise contours of the futility exception are not well-defined, courts take into account factors such as "the defendants' hostility, delay and obstruction." *Homefront Org., Inc. v.*

*Motz*, 570 F.Supp.2d 398, 407 (E.D.N.Y.2008).  Courts in the Second Circuit have recognized, however, that mere allegations of open hostility are not sufficient to invoke the futility exception. *Norwood v. Salvatore*, No. 12-cv-1025, 2015 WL 631960, at *5 (N.D.N.Y. Feb. 13, 2015) (internal citations and quotations omitted); *Osborne v. Fernandez*, No. 06-cv-4127, 2009 WL 884697, at *6 (S.D.N.Y. Mar. 31, 2009), aff'd, 414 F. App'x 350 (2d Cir. 2011) (rejecting futility argument based on allegations that "defendant decisionmakers were hostile to plaintiffs' proposed development or act[ed] in bad faith").

Similarly, if a plaintiff demonstrates that the governmental authority "burden[s the] property by imposition of repetitive or unfair land use procedures in order to avoid a final decision," she is absolved from the finality requirement. *Sherman*, 752 F.3d at 562 (internal quotation marks omitted) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 621, 121 S. Ct. 2448, 150 L.Ed.2d 592 (2001)).  While some courts consider futility and unfair/repetitive procedures to be distinct concepts, the analyses for the two tend to be the same.  *Id*.  It is not easy to distinguish "merely frustrating" procedures from "unfair" or "futile" ones, but where "the government's actions are so unreasonable, duplicative, or unjust as to make the conduct farcical, the high standard [of these exceptions] is met."  *Id*.

### Plaintiff's Claims Are Not Yet Ripe For Federal Review

Plaintiff acknowledges that it has not received a final determination of its application to build a religious Jewish cemetery on the Property. (Pl.'s Opp. at 20–21.)  Plaintiff concedes that it never sought any variance, and explains that the reason why it did not do so was because "the Planning Board refused to provide any guidance" as to how to obtain one.  (Compl. ¶¶ 248, 292.) The Court notes that this explanation is insufficient, particularly as courts have required that a plaintiff at least show that it attempted to apply for a variance before its claim can be considered

ripe.  *See Sunrise Detox V, LLC*, 769 F.3d at 124 ("[the plaintiff's] own failure to submit at least one meaningful application for a variance prevents us from determining whether the board has dug in its heels and made clear that all such applications will be denied").  Notably, courts have found that a property owner "need not pursue such applications when a zoning agency lacks discretion to grant variances,"  but such allegations are not raised here.  *See id*.

Nor does Plaintiff plead whether the Planning Board adopted the determinations made by the Town attorney in his May 2021 letter.  Even if it did,  Plaintiff never sought an appeal to the ZBA, the final decision-maker.  This also weighs against a finding that Plaintiff's claims are ripe. *See Dean v. Town of Hempstead*, 163 F. Supp. 3d 59, 87–88 (E.D.N.Y. 2016) (citing *545 Halsey Lane Props., LLC v. Town of Southampto*n, 2015 WL 2213320, at *7 (E.D.N.Y. May 8, 2015) (finding that although the town attorney took a position on a relevant issue, "there has been no commentary by the Planning Board itself indicating that this [is] an entrenched position of any kind");  *Homefront Org., Inc*., 570 F.Supp.2d at 409 (noting that despite a defendant's negative views, "the Planning Board or the BZA could approve the proposal"); *S&R Dev. Estates, LLC*, 588 F.Supp.2d at 463 ("The Town's alleged hostility and bias can not be imputed to the ZBA simply because the Town appoints the ZBA members.").

Plaintiff, however, relies on the futility exception to the ripeness doctrine to argue that it need not wait for a final determination because Defendants have effectively "dug in [their] heels" and made clear that its application will be denied.  (Pl.'s Opp. at 15.)  Plaintiff also argues that  it need not wait for a final decisions because the Defendants have imposed repetitive or unfair land use procedures in order to avoid a final decision.  (*Id*. at 15–16).  *Lubavitch of Old Westbury, Inc. v. Inc. Vill. of Old Westbury, New York*, No. 208CV5081DRHARL, 2021 WL 4472852, at *12 (E.D.N.Y. Sept. 30, 2021) ("if a plaintiff demonstrates that the governmental authority "burden[s

the] property by imposition of repetitive or unfair land use procedures in order to avoid a final decision," she is absolved from the finality requirement."). Plaintiff relies in large part on its allegations that Defendants have drawn out the application process since 2014, and continues to stall the Project by raising additional requirements before Plaintiff can commence building a religious cemetery. (Compl. ¶¶ 5, 9.)

To avoid the finality requirement, Plaintiff must satisfy a "high standard" met only "when the government's actions are so unreasonable, duplicative, or unjust as to make the conduct farcical." *Sherman*, 752 F.3d at 563. Plaintiff fails to meet that high standard here.

First, in pleading futility, Plaintiff cannot rely on the delay it alleges, particularly as its own actions and activities contributed to the delay in meaningful part. Plaintiff avers that Defendants' requirements have delayed the Project for seven years (since 2014) as of the filing of the Complaint on August 20, 2021. (Pl. Opp. at 16.) Plaintiff points to the following: (i) Defendants' challenge to its good title to parts of the Property back in April 2014; (ii) the Town's 2016 Moratorium on the development of cemeteries; (iii) the Planning Board's delayed issuance to the second Commence Work Permit; (iv) and now, the Town attorney's recommendation that Plaintiff obtain consent from families of individuals interred in unmarked graves. (Pl. Opp. at 16–17.) However, Plaintiff's own allegations show that it contributed to its own delays over the past seven years in the following ways: (i) Plaintiff commenced a Quiet Title Action against LCC on or about July 23, 2015 and obtained a so-ordered stipulation on August 31, 2016, but chose to not undertake site analyses pending the Quiet Title Action in order to avoid expenses (Compl. ¶¶ 186–90; 231); (ii) Plaintiff waited four months after the expiration of the 2016 Moratorium on cemetery development to request to be reinstated to the ZBA agenda (Compl. ¶ 211); (iii) Plaintiff applied for a second Commence Work Permit three months after it received the "House of Worship" designation, which

served as a special permit allowing a cemetery on the Property; and (iv) Plaintiff conducted hydrogeological field investigations and data collections starting in December 2018 and finally submitted an application and accompanying hydrogeological report to the Planning Board on or about May 4, 2021, which was delayed in part due to the COVID-19 pandemic in 2020.  (Compl. ¶¶ 254, 260.)  In other words, the ball was in Plaintiff's park for a little more than half of those seven years it complains about, and it therefore cannot impute the complete duration of the delay onto Defendants.

Moreover, while there is no precise cut-off, cases in this Circuit have found that delays as long as eight years are insufficient to surmount the finality requirement.  *See Dean,* 163 F. Supp. 3d at 87 (citing cases);  *Osborne*, 2009 WL 884697, at *6 (collecting cases holding that futility exception was not established when delays lasted two, three, five, and eight years).  The delay here, now eight years since the filing of the Complaint, is still not considerable enough to overcome the finality requirement on its own.  *See c.f., Lubavitch of Old Westbury, Inc.*, 2021 WL 4472852, at *12 ("The twenty-year delay here, even attributing some portion thereof to [p]laintiffs' conduct, easily clears the "considerable" bar.");  *Sherman*, 752 F.3d at 562 (finding the the plaintiff overcame the finality requirement where the town had used repetitive procedures and changed zoning regulations for over ten years to avoid a final decision).

Second, Plaintiff argues that Defendants are imposing repetitive or unfair land use procedures in order to avoid a final decision.  (Pl.'s Opp. at 17.)  Plaintiff argues that the May 2021 Letter by the Town attorney raised challenges that were already addressed, including that the County Parcels had not been transferred to Plaintiff even though the County Legislature previously communicated it would do so after approvals were obtained.  (Compl. ¶ 275.)  The May 2021 letter also raised new issues that Plaintiff argues should have been raised years ago, including the Town

attorney's opinion that the Town may have an ownership right to some or all of the property under state law.  (*Id*. ¶¶  280, 282; Exh. FF.)  Plaintiff argues that the Town attorney is now recommending a burdensome requirement to have Plaintiff obtain consent from families of people interred in unmarked graves.  (*Id*. ¶ 279.)  Plaintiff claims that essentially, it is back to "square one" despite years of going through the application process.  (Pl.'s Opp. at 13.)

The  additional  requirements,  particularly  those  that  purportedly  have  already  been addressed throughout the application process, do raise some concern.  However, these issues, taken together with Plaintiff's own self-imposed delays, Plaintiff's failure to plead whether the Planning Board adopted the recomendations in the Town attorney's May 2021 letter, and Plaintiff's ability to appeal to the ZBA, still leads to a finding that Plaintiff's claims do not reach the high standard needed to overcome the finality requirement.  Plaintiff's allegations are distinguishable from those in *Sherman*, where the town enacted new zoning regulations five times over a five-year period, and where the town: (i) required the plaintiff to submit new development plans each time the town announced  a  moratorium  on  development  that  applied  only  to  the  plaintiff;  (ii)  replaced  its officials;  (iii)  required  the  plaintiff  to  resubmit  studies  already  completed;  and  (iv)  required plaintiff to pay $65,000 in fees before he could obtain a hearing.  *Sherman*, 752 F.3d at 556–63. This case is also distinguishable from *Lubavitch of Old Westbury, Inc*., where the plaintiff went "back to the drawing board on several occasions."  *Lubavitch of Old Westbury, Inc.*, 2021 WL 4472852, at *14.  There, "the parties conducted multiple instances of years-long negotiations, culminating in [p]laintiffs submitting an agreed-upon application, only to have Defendants deny it" including: (i) "negotiations between 2001 and 2005; [p]laintiffs' 2006 application denied in 2007"; and (ii) "negotiations between 2009 and 2015; [p]laintiffs' 2015 application denied same day and instructed 'to start their religious land use application from the beginning'").  *Id*.

Here, even viewing the allegations in the light most favorable to Plaintiff, Defendants' alleged requirements appear to be well within the realm of "give-and-take negotiations" expected from land-use approvals. *See Sunrise Detox V, LLC*, 769 F.3d at 124.  Defendants' questions and requirements regarding good title and environmental issues appear reasonable, particularly in light of LCC's (not just the Town's) challenges to Plaintiff's good title over Lot 33, and Plaintiff's own allegation that Lot 29 is mostly situated in a large, regulated wetland area.  (Complaint ¶¶ 21, 41, 125.)  In addition, the allegations show that while there were delays, in part because of Plaintiff's own actions,  there was continual progress on the application.  For example, both of Plaintiff's Commence Work Permits were granted, and Plaintiff was also granted a a "House of Worship" special permit allowing a religious cemetery to be built on the Property.  (Complaint ¶¶ 110, 228–29, 249.)  While Plaintiff asserts that the Town attorney wants to now impose a burdensome requirement that Plaintiff obtain consent of the family members of unmarked graves, the May 2021 letter, which Plaintiff attaches to the Complaint, shows that such concern arose from findings by its own hydrogeologist report indicating that there are many more burials on the Property than previously acknowledged, and therefore there may be additional graves beyond the areas surveyed. (Compl.¶¶ 279–80, Exh. FF.)

In addition while Plaintiff indicates "it is back to square one,"  Plaintiff contradicts itself by showing that the May 2021 Town attorney letter specified the issues that should be addressed before the application could proceed.  (Pl.'s Opp. at 13; Compl. ¶¶ 279–80, Exh. FF.)  *See Dean*, 163 F. Supp. at 88 ("Although the Town has imposed several burdensome steps on [plaintiff], I cannot find that their actions have been so unreasonable, duplicative, or unjust,  that further applications by [plaintiff] would be futile. In fact, the Town has outlined the steps that it expects [plaintiff] to take. Thus, I conclude that [a] federal lawsuit at this stage would inhibit the kind of

give-and-take negotiation that often resolves land use problems, and would in that way impair or truncate a process that must be allowed to run its course.") (internal quoitations and citations omitted).  Nor has Plaintiff alleged it has been "back to square one" on more than one occasion, which would be more suggestive that efforts to go through the Town's zoning board process are indeed futile.  *See, c.f.*, *Lubavitch of Old Westbury, Inc*, 2021 WL 4472852, at *14.

Therefore, the Court finds that Plaintiff's claims are not yet ripe for review by this Court.

## II.   <u>Statutes of Limitations</u>

Defendants argue that Plaintiff's claims are all barred in part by the applicable statutes of limitations.  (Defs.' Br. at 10–13.)  Specifically, Defendants argue that the Court may not consider acts alleged by Plaintiff in support of its RLUIPA claims that occurred prior to August 20, 2017, or more than four years since the filing of the Complaint.  (*Id.*)  *See Young Men's Christian Ass'n of Greater Rochester v. Town of Milo*, 563 F. Supp. 3d 71, 80 (W.D.N.Y. 2021) ("RLUIPA claims carry a four-year statute of limitations") (citing *Congregation Adas Yereim v. City of New York*, 673 F. Supp. 2d 94, 107 (E.D.N.Y. 2009) ("It is undisputed that the four-year catch-all federal statute of limitations, codified at 28 U.S.C. § 1658(a), governs claims brought under RLUIPA.")).  Defendants also argue that for Plaintiff's Section 1983 claim, any acts that occurred prior to August 20, 2018 are barred.  (Defs.' Br. at 10–13.)  *See Roman Cath. Diocese of Rockville Ctr., New York v. Inc. Vill. of Old Westbury*, No. 09-CV-5195-DRH-ETB, 2011 WL 666252, at *12 (E.D.N.Y. Feb. 14, 2011) ("In an action arising in New York pursuant to Section 1983, the applicable statute of limitations is "borrowed from New York's general statute of limitations for personal injury actions," which is three years.").

Plaintiff, on the other hand, argues that its claims are all timely, and that all allegations supporting those claims are also timely because the continuing violation doctrine applies.  (Pl.'s

Opp. at 11–14.)  *Roman Cath. Diocese of Rockville Ctr., New York*, 2011 WL 666252, at *12 ("Where a plaintiff can demonstrate an ongoing or continuing violation of his federally protected rights, 'the plaintiff is entitled to bring suit challenging all conduct that was a part of the violation, even conduct that occurred outside the limitations period.").

Because Plaintiff's claims are determined to be unripe at this time, the Court need not decide on the extent to which the applicable statute of limitations apply to each of Plaintiff's claims.

**III.**    **Failure to State a Claim**

Plaintiff asserts three claims against all Defendants: (1) A RLUIPA claim for "substantial burden" under 42 U.S.C. § 2000cc-2(a); (2) another RLUIPA claim for "equal terms" under 42 U.S.C. § 2000cc-2(b)(1); (3) and a 42 U.S.C. § 1983 claim for alleged violations of the Plaintiff's rights under the Fourteenth Amendment.  (Compl. ¶¶ 300–28.)  Because the Court determines that Plaintiff's claims are not yet ripe, *see supra*, the Court dismisses these claims without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  Plaintiff's Complaint is DISMISSED without prejudice with leave to refile consistent with this Opinion and Order.

The Court of the Clerk is kindly directed to terminate the motion at ECF No. 18, and this action.

Dated:  September 20, 2022                                      SO ORDERED:
       White Plains, New York

_____
      NELSON S. ROMÁN
     United States District Judge